IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| JONYA C. HAWKINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 5:07-CV-02064-KOB |
| | ) |
| MICHAEL J. ASTRUE, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I. Introduction**

The claimant, Jonya C. Hawkins, filed an application for disability insurance benefits and supplemental security income payments on September 4, 2003, alleging disability commencing on November 7, 2001, due to congenital amputation of the right hand; carpal tunnel and overuse of the left hand; degenerative disc disease; obesity; and depression. The Commissioner denied the claims on February 4, 2004. The claimant requested a hearing before an Administrative Law Judge. The ALJ held a hearing on June 16, 2005. At the hearing, the claimant amended her onset date to February 28, 2003. In a decision dated December 9, 2005, the ALJ found that the claimant was not disabled within the meaning of the Social Security Act and, therefore, was not eligible for SSI or DIB payments. The claimant then applied to the Appeals Council for review. The Appeals Council granted the claimant's request for review, and on July 24, 2006, remanded the case to the ALJ. On remand, the ALJ held a second hearing on October 5, 2006. In a decision dated November 6, 2006, the ALJ found that beginning on April 5, 2005, the claimant was

1

disabled for the purposes of the Social Security Act. However the ALJ found that the claimant was not disabled on June 30, 2003, the date she was last insured for disability insurance benefits. On September 11, 2007, the Appeals Council denied the claimant's request for review. This denial constituted the final decision of the Commissioner of Social Security. The claimant has exhausted his administrative remedies, and the case is now before the court for judicial review under 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the court will AFFIRM in part and REVERSE and REMAND in part the decision of the Commissioner.

## II. Issues Presented

In this appeal, the claimant argues that the Commissioner's decision was not based upon substantial evidence because the ALJ failed to properly weigh the opinions of examining and consulting physicians, and the ALJ erred in choosing April 2005 as the disability commencement date.

## III. Standard of Review

The standard for reviewing the Commissioner's decision is limited. Under this limited standard of review, this court will not decide the facts anew, make credibility determinations, or re-weigh the evidence. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2000); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

However, "no . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims."

*Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations de novo, but the Commissioner's factual findings must be supported by substantial evidence. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971). The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. Furthermore, a reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence on which the ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. Legal Standard

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2000). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?

>An affirmative answer to any of the above question leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R.§§ 404.1520, 416.9201 (2008).

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and either

>(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain.

Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir.1991); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529.

## V. Insured Status

To be eligible for SSDI benefits, a claimant must have had "insured status" at the time he or she became disabled. Generally, this requirement means that the claimant has paid Social Security taxes through employment or self-employment for a minimum of 20 of the 40 quarters prior to his or her disability onset date. 42 U.S.C. § 416(i)(3)(B). The latest date of the claimant's insured status was June 30, 2003. Therefore, to receive SSDI benefits, she must have been disabled on or before June 30, 2003.

## VI. Facts

The claimant was thirty-five years old at the time of the second hearing and has a high school education with some college coursework. (R. 10, 418). Her past work includes employment as a waitress, receptionist, and office worker. (R. 22). According to the claimant,

4

she became disabled on February 28, 2003 because of congenital amputation of the right hand; carpal tunnel and overuse of the left hand; degenerative disc disease; obesity; and depression. (R. 56, 347). The claimant has not engaged in substantial gainful employment since February 28, 2003. (R. 15).

On November 30, 2001, Dr. Eric Beck, a consulting physician who is a physical medicine, rehabilitation, and electrodiagnostic medicine specialist, diagnosed the claimant with mild left carpal tunnel syndrome. During her visit with Dr. Beck, the claimant complained of pain in digits one, two, and three of the left hand; and paresthesias in the left digit. She also reported associated weakness in the hand. Dr. Beck also found the claimant had a "fairly prominent trigger point in the left trapezius muscle, which does not reproduce her arm and hand paresthesias." (R. 132-134).

On December 17, 2001, Dr. John Walker, a treating physician who is an orthopaedic surgeon, performed left carpal tunnel release surgery. (R. 138). On January 14, 2002, the claimant asked Dr. Bryan Evans, a treating family practice physician, about the relationship of her carpal tunnel syndrome to her work. She asked if her carpal tunnel syndrome could have been produced over a two or three month period of time, and Dr. Evans acknowledged that possibility. (R. 144).

Although Dr. Evans continued to treat the claimant in 2002 and 2003, the other visits were unrelated to her left hand pain: May 30, 2002 - bronchitis; August 16, 2002 - dyspnea (difficulty breathing), obesity, fatigue, and enlarged thyroid; September 25, 2002 - medication for weight loss, refilled in October; February 19, 2003 - shortness of breath with chest pain but normal pulmonary function test, doctor finding of probable underlying depression with secondary

panic attacks, CT scan revealing gall stones; July 7, 2003 - persistent weight gain and irritable bowel syndrome with diarrhea. (R. 163, 164, 165, 166).

After a follow up visit with the claimant on February 26, 2002, Dr. Walker wrote that she was "doing very well and not complaining of any significant deficits in range of motion, but she still has a fair amount of pain going into the thumb. She is back to work and that has caused some pain, but she is able to do it." (R. 150). On April 25, 2002, Dr. Walker found the claimant had reached maximum medical improvement. Because the claimant continued to complain of occasional pain, Dr. Walker put her on a restriction of working three days a week until June 17, 2002, "at which time she can work out her own schedule thereafter." (R. 150). The record does not reflect that Dr. Walker extended the restriction past June 17, 2002.

On August 8, 2002, presumably after the claimant returned to work full time, Dr. Walker found that the claimant had mild pain in her left hand. A physical exam indicated the claimant had an excellent range of motion, no warmth, no swelling, no erythema, and minimal tenderness over the dorsum of the hand. Dr. Walker also indicated that the wound from the surgery was "very well healed." Dr. Walker prescribed Celebrex for the claimant's aches and pains. Walker wrote that he would continue to see the claimant on an as needed basis. (R. 149).

On February 28, 2003, the alleged on-set date of disability, the claimant underwent a laparoscopic cholecystectomy (surgical removal of gallbladder) with cholangiogram (x-ray examination of the bile ducts). Dr. Peter Vevon performed the procedure. (R. 234).

On October 18, 2003, the claimant went to the Huntsville Hospital emergency room with complaints of shoulder, chest, and neck pain. The claimant was diagnosed as having a urinary tract infection and an acute cervical myofascial strain (strained neck muscle). (R. 226). On

6

February 21, 2004, the claimant visited the Huntsville Hospital emergency room with complaints of back and right flank pain. (R. 216).

Disability Determination Services referred the claimant to Dr. S. Aggarwal, a physical medicine, rehabilitation, and pain management specialist, for a consultative examination. During Dr. Aggarwal's examination of the claimant on January 16, 2004, the claimant was 5 feet 8 inches tall and weighed 220 pounds. Dr. Aggarwal diagnosed the claimant with carpal tunnel syndrome in the left hand and congenital amputation below the right elbow. He found that the claimant could lift no more than 10 lbs. Dr. Aggarwal wrote that the claimant should avoid activities that require fine motor coordination. Dr. Aggarwal opined that the claimant's condition "precludes her from gainful employment." (R. 182-184).

On February 26, 2004, Dr. Evans found that the claimant had low back pain with radicular symptoms. (R. 294). On March 3, 2008, magnetic resonance imaging of the lumbar spine revealed mild disc desiccation at the L4-L5 interspace with no focal disc herniation identified. (R. 295). Dr. Evans referred the claimant to Dr. Larry Parker of The Spine Center at SportsMed.

During a visit with the claimant on March 16, 2004, Dr. Parker, an orthopaedic surgeon, found that she had "primarily axial or mechanical back pain of about a year's duration." An MRI showed light bulging at L4-L5 and L5-S1. Dr. Parker found that the claimant was moderately obese and stated that she walked with an erect posture and a normotaxic gait. He noted the claimant had gained weight since she quit smoking and he stated that this weight gain probably contributed to her symptoms. Dr. Parker recommended non-surgical management with physical therapy. (R. 284-285).

In a letter dated April 21, 2004, Dr. Evans wrote that he last saw the claimant on February 26, 2004. He wrote that the claimant had "a myriad of psychiatric and physical problems which have led her to have difficulty continuing her regular work activity." He stated the claimant was "presently disabled not only from the absence of her right arm, but also from her compensation of having to use her left arm along with her progressive back pain and her weight gain." Dr. Evans wrote that the claimant had "difficulty with any sitting or standing for prolonged period of time, any bending forward, and any prolonged walking." (R. 287).

In a "Physical Capacities Evaluation" dated April 5, 2004, Dr. Evans indicated that the claimant could occasionally lift five pounds or less. He indicated that the claimant could sit for two hours and stand or walk for two hours during an eight-hour workday. He also found that the claimant could not climb, balance, or work with exposure to hazardous machinery. Dr. Evans indicated that the claimant could occasionally push or pull with her arm and legs. He also indicated that she could occasionally perform gross and fine manipulation and that she could occasionally bend, stoop, and reach. Dr. Evans indicated that the extent of the claimant's pain, fatigue, or weakness distracts from and negatively affects adequate performance of daily activities or work. In response to a question asking "to what extent will physical activity, such as walking, standing, bending, stooping, moving of extremities, etc. increase the level of fatigue/ weakness experienced by [the claimant]?" Dr. Evans circled the answer, "greatly increased fatigue/weakness and to such a degree as to cause a total abandonment of tasks." (R. 288-292).

During a visit on April 27, 2004, Dr. Evans diagnosed the claimant with pharyngitis, rosacea, elevated liver function test, and arthritis. (R. 334). On December 28, 2004, Dr. Evans prescribed Lexapro to treat depression and generalized anxiety disorder. During a visit with Dr.

Evans on February 9, 2005, the claimant complained of pain in the ear and jaw, and Dr. Evans prescribed Skelaxin, a muscle relaxant. On May 24, 2005, Dr. Evans prescribed Cymbalta, a medication used to treat depression, anxiety, and fibromyalgia. (R. 316).

On February 23, 2005, the claimant visited Dr. Walker to check her left hand. The claimant told Dr. Walker that the hand had become swollen, stiff, and "just generally sore." (R. 340). X-rays of the hand revealed no bony abnormalities or arthritis. Dr. Walker referred the claimant to Dr. William Shergy, a consulting rheumatologist. During a joint examination on March 15, 2005, the claimant showed a full range of motion in all joints with some mild degenerative disease in the hand. Dr. Shergy noted several soft tissue tender areas in classic fibromyalgia trigger point regions. Dr. Shergy found no clear evidence of an inflammatory synovtis or connective tissue disease.  He suspected the claimant had underlying fibromyalgia and perhaps recurrent carpal tunnel.  Dr. Shergy recommended the claimant take 10 mg of Flexeril, a muscle relaxant, an hour before bedtime. He also suggested aerobic exercise. (R. 304-305).

During a visit with Dr. Walker on April 4, 2005, the claimant complained of continued "vague numbness and tingling in the left hand with some diffuse pain." Dr. Walker referred the claimant to Dr. Beck, who performed an electrodiagnostic evaluation. Dr. Beck found no electrodiagnostic evidence of left carpal tunnel syndrome. He also noted "no evidence of a left ulnar entrapment at the wrist or elbow or of a polyneuropathy." Dr. Beck stated that the left cervical radicular screen was normal. (R. 310-313).

During a visit with Dr. Walker on April 20, 2005, the claimant complained of pain and swelling in her left hand. She stated that the hand bothered her on an everyday basis. Dr. Walker

found mild swelling in the hand and a "negative Tinel's over the ulnar nerve." He also found the claimant had excellent range of motion of the elbow and wrist. He stated that the claimant still had some vague decreased sensation in the ring and small finger. Dr. Walker assessed pain and swelling in the left hand, but did not recommend further surgery. He stated that the claimant could continue to see Dr. Shergy and that the claimant could return to him on an as needed basis. (R. 339).

On August 8, 2005, the claimant visited Dr. Carol Walker, a consultative neuropsychological examiner. She diagnosed adjustment disorder with mixed emotional features. She also found that the claimant had an unimpaired capacity to understand and follow instructions and she stated that the claimant should have no difficulty completing simple or complex instructions. She determined that the claimant's expressive and receptive language was unimpaired. She also wrote that the claimant "is unlikely to have difficulty interacting with co-workers, supervisors, or others in a work environment." (R. 325). She wrote that the claimant exhibited no difficulty maintaining attention or concentration during the evaluation and opined that the claimant's mental impairment is mild. In the "Prognosis" section of her report, Dr. Walker stated that the prognosis for the claimant's "emotional condition is tied to her pain. If she experiences an improvement in her pain, concomitant improvement in her emotional status is expected." (R. 322-325).

### First Hearing

On June 16, 2005, the ALJ held a hearing on the claimant's application for benefits and issued an opinion on December 9, 2005. At the beginning of the hearing, the claimant amended her onset date to February 28, 2003. (R. 56, R. 416). During the hearing, the claimant testified

10

that pain in her left arm, hands, and fingers; two herniated discs in her back; and fibromyalgia prevented her from working. (R. 420-421). The claimant testified that she could sit in a chair for fifteen or twenty minutes at a time, stand for fifteen to thirty minutes at a time, and walk for fifteen to twenty minutes at a time. (R. 421-422). The claimant stated that she did not lift objects unless she had to. When asked what she could lift, she said she could lift a glass if it has a handle. (R. 422).

The claimant testified that while sitting and sedentary, her pain was a six on a ten point scale. (R. 423). She said that when she does household chores or buys groceries, her pain could easily be an eight on a ten point scale. (R. 423-424). When asked if she had problems sleeping at night, the claimant testified that she did not sleep solidly and had to wake up several times at night. (R. 424). The claimant stated she had panic attacks that could happen anywhere. (R. 425). The claimant stated that her last job was at a pawn shop. She testified that while working at the pawn shop, she "had to do a lot of stocking and stuff with the jewelry and little minute, fine things, as far as, putting little rings in little boxes." She also said that this job required her to stuff envelopes. (R. 426). The claimant testified that when she took breaks from working (such as a two and a half week long vacation), the pain in her hand decreased, but the pain returned when she began working again. (R. 426-427).

The claimant testified that her daily activities included driving her children to school, attending school functions, preparing meals, doing laundry, and attending church more than once a week. (430-431). The claimant listed the anti-depressant Cymbalta as her only current prescription drug and stated that she had never been treated by or been referred to any mental health facility, psychologist, or psychiatrist. (R. 431-432).

11

The ALJ asked a vocational expert to describe the claimant's past work. The vocational expert said the claimant had been a waitress, sales clerk, and receptionist, and the skills of the last two jobs would be transferable and existed in sufficient quantities in the state of Alabama. The vocational expert testified that if the answers Dr. Evans provided on the physical capacities evaluation and pain form were credible, the claimant would not be able to work full-time. (R. 434).

## The ALJ's First Decision

In his decision after the first hearing, the ALJ found that the claimant was insured for Disability Insurance Benefits from January 1, 2003, to June 30, 2003. The ALJ explained that the medical records failed to document a sufficient objective basis to wholly accept the claimant's allegations. Applying the three-part pain standard, the ALJ stated that although the claimant presented evidence of an underlying medical condition, the objective medical evidence did not confirm the severity of the pain alleged by the claimant, and that the claimant's symptoms could not be reasonably expected to give rise to the alleged pain. The ALJ said the claimant's allegations and Dr. Evans's assessment of her condition were inconsistent with claimant's own testimony regarding her activities of daily living, such as driving her children to school, attending school functions, preparing meals, doing laundry, and attending church more than once a week. The ALJ accepted the mental impairment assessment of Dr. Carol Walker, who found that the claimant only had "mild" mental limitations. (R. 352).

The ALJ found the claimant had the residual functional capacity to perform a full range of light work that could be managed without the use of the non-dominant right arm below the elbow. The ALJ stated that the claimant's medically determinable impairments did not preclude

her from performing her past work as a sales clerk, waitress, or receptionist. For this reason, the ALJ concluded that the claimant was not under a disability as defined by the Social Security Act.

## Appeals Council Decision

The claimant appealed the ALJ's findings to the Appeals Council and the council granted the request for review. In an order dated June 24, 2006, the Appeals Council vacated the hearing decision and remanded the case for further proceedings. The order requested that the ALJ indicate the weight given to Dr. Aggarwal's and Dr. Evans's opinion of the claimant's ability to perform work-related functions and provide a further evaluation of those doctors' assessments. The Appeals Council asked that the ALJ obtain any appropriate updated medical records from the claimant's treating and other medical sources, as well as supplemental evidence from a vocational expert "to clarify the effect of the assessed limitations on the claimant's occupational base." In addition, the order stated that "the hypothetical questions should reflect the specific capacity/limitations established by the record as a whole." (R. 360-362).

## Second Hearing

The ALJ held a second hearing on October 5, 2006 and issued a second opinion on November 5, 2006. During the hearing, the claimant stated that although Dr. John Walker referred her to a physical therapist, she could not go to physical therapy because she was unable to afford it. (R. 390). The claimant said she takes Laxapro for anxiety and depression. She stated that Dr. Evans gives her samples of this prescription medication. (R. 392-393). The claimant said that Laxapro helps with her anxiety and depression, but that stressful situations can cause her to "kind of panic a little bit." (R. 404). The claimant also said that she takes Aleve, Tylenol, and Advil. (R. 393).

Testifying about daily activities, the claimant stated that during the day, she attempts to get her children ready for school, washes clothes, goes to the grocery store, and helps her parents. (R. 406). She said she goes to church, but she had to abandon her hobby of scrapbooking because it required too much work with her hand. (R. 408). The claimant testified she is unable to carry a purse. (R. 393). She stated that holding a purse hurt her left hand and carrying a purse on her shoulder hurt her back. (R. 394). The claimant testified that she has problems fastening buttons and using zippers. (R. 395). She stated that any activities that require repetitive motion hurt her badly. (R. 395). When asked what she could lift, she said "my fork is about it." (R. 395). She stated that she does not carry groceries "other than maybe a sack of bread or some chips." (R. 395-396). The claimant stated that she has trouble standing. (R. 402). The claimant testified that she is only able to sleep "a little bit at night" because she has to wake up due to pain in her arm or back. (R. 397). The claimant has to take naps during the day because of a lack of sleep at night. (R. 398).

At the end of the hearing, the ALJ asked the vocational expert to classify the claimant's past work. The vocational expert stated the claimant's past work included work as a waitress, which is a light semiskilled job; work as receptionist, which is classified as sedentary semiskilled; and work as an office clerk, which is a light semiskilled position. (R. 411-413).

### The ALJ's Second Decision

In his second decision, the ALJ found that before April 5, 2005, the claimant had the residual functional capacity to perform a full range of light work that could be managed with the use of the non-dominant right hand and arm below the elbow. The ALJ wrote that he was applying the three-part pain standard. (R. 20). The ALJ stated that, although one could

reasonably expect that the claimant's medically determinable impairments would produce her alleged symptoms, the claimant's statements about the intensity, persistence and limiting effects of her symptoms were "not entirely credible prior to April 5, 2005." He explained that the medical records failed to document a sufficient basis to accept the claimant's allegations as wholly credible. (R. 19). The ALJ wrote that he "accepts the limitation assessed by Dr. Evans as of April, 5, 2004, but not before that date." The ALJ explained that he rejected the opinion of Dr. Aggarwal because he only saw the claimant once and because "the final responsibility for deciding the issue of disability is reserved to the Commissioner of the Social Security Administration." (R. 20).

The ALJ relied upon the assessment of Dr. John Walker, a treating physician. The ALJ discussed Dr. Walker's office notes of February 26, 2002, which stated that the claimant "is doing very well and not complaining of any significant deficits in range of motion." Dr. Walker also observed that the claimant "is back to work and that has caused some pain, but she is able to do it." (R. 20). The ALJ discussed the claimant's April 2005 visit to Dr. Walker, during which the claimant complained of "vague numbness and tingling in the left hand and some diffuse pain." The ALJ noted that Dr. Walker ordered an electrodiagnostic evaluation of the claimant's arm and that it "revealed no evidence of left carpal tunnel syndrome; no evidence of left ulnar entrapment at the wrist or elbow or of a polyneuropathy." The ALJ explained that "these clinical findings undercut the assessment of Dr. Aggarwal, who based disabling limitations on his diagnosis of carpal tunnel syndrom on the left." (R. 20-21). The ALJ accepted the assessment of Dr. Carol Walker, who found the claimant had only mild mental limitations. (R. 21).

The ALJ found that prior to April 5, 2005, the claimant was capable of performing her past relevant work, which included work as a waitress, receptionist, and office clerk. He stated that because these positions "did not require the performance of work activities precluded by her medically determinable impairments, she was able to return to this type of work through April 5, 2005." The ALJ observed that in the past, the claimant performed "work requiring light or less exertion despite the fact that she did not have a hand and arm below the right elbow." (R. 22).

The ALJ found that beginning on April 5, 2005, the claimant's residual functional capacity allowed her to lift five pounds occasionally, sit two hours total, and stand or walk two hours total in an eight-hour workday. He found that the claimant could not climb, balance, or work with exposure to hazardous machinery. He also found that she could occasionally push or pull with her arm or leg, perform gross fine manipulation, bend, stoop, and reach. He found that the claimant had pain, fatigue, and weakness to such an extent as to be distracting to adequate performance of daily activities or work and that physical activity greatly increases her pain and weakness to such a degree as to cause distraction from or total abandonment of tasks. (R. 21). The ALJ explained that based upon the medical records of Dr. Evans, the claimant's allegations of chronic debilitating pain were credible as of April 5, 2004. (R. 21). The ALJ found that beginning on April 5, 2005, the claimant's residual functioning capacity prevented her from being able to perform past relevant work. (R. 22).

The ALJ found that prior to April 5, 2005, the claimant was not disabled but that she became disabled on that date, and that her disability continued through the date of his decision. (R. 23).

VII. Discussion

A. Consideration of the Medical Evidence of Record

In arguing that the ALJ should have chosen February 2003 instead of April 2005 as the disability onset date, the claimant contends that the ALJ failed to properly weigh the opinions of examining and consulting physicians, despite a direct request from the Appeals Council. Specifically, the claimant contends that the ALJ should have given greater weight to the findings of Dr. Evans and Dr. Aggarwal. The Commissioner asserts that substantial evidence supports the ALJ's decision.

"The claimant bears the burden of demonstrating that he cannot return to his past relevant work." *Lucas v. Sullivan*, 918 F.2d 1567, 1571 (11th Cir. 1990). The claimant has the responsibility to furnish medical and other evidence regarding her impairments and the effect the impairments have on her ability to work. *See* 20 C.F.R. § 404.1512(a) and (c), § 416.912(a) and (c) (2007). To receive SSDI benefits, the claimant must demonstrate that she was disabled on or before June 30, 2003, her date last insured. *See* 42 U.S.C. § 423(a) and (c); 20 C.F.R. § 404.101, § 404.130, § 404.131 (2007). Any impairment that arose after that date cannot support a finding for disability benefits, although the date last insured is inapplicable to SSI benefits. *See Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986); *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The claimant faults the ALJ for not adequately considering the notes of a treating physician, Dr. Evans. The "Physical Capacities Evaluation" form that Dr. Evans filled out is dated April 5, 2004, almost a year after her date last insured. The claimant asserts that the ALJ concluded the claimant "was disabled on that day and that day alone, with all of Dr. Evans'

preceding notations of pain and limitation being somehow rendered invalid." (Claimant's Brief p. 9). The claimant, however, failed to identify what, if any, "notations of pain and limitation" by Dr. Evans before April 5, 2004 the ALJ should have considered. Although the record does reflect that the claimant spoke with Dr. Evans about her left hand in early 2002, shortly after her carpal tunnel surgery, his subsequent treatment notes do not record any further complaints about her hand or back until 2004. And, although the record does reflect that she received follow up treatment from Dr. Walker regarding her hand in 2002, by August 2002, Dr. Walker's chart records only *mild* pain in her left hand, with no swelling and minimal tenderness. The claimant also emphasizes the ALJ's rejection of Dr. Aggarwal's notes from January 26, 2004. In this report, Dr. Aggarwal opined that the claimant's "condition precludes her from gainful employment." Like Dr. Evans's "Physical Capacities Evaluation," Dr. Aggarwal's assessment was completed well after June 30, 2003 – the date that the claimant was last insured.

      The Appeals Council ordered the ALJ to weigh and further evaluate the opinions of Dr. Aggarwal and Dr. Evans. In his second opinion the ALJ explicitly rejected the opinion of Dr. Aggarwal. The ALJ's explained that Dr. Aggarwal only saw the claimant once and he also stated the "final responsibility for deciding the issue of disability is reserved to the Commissioner." He also stated that the assessment of Dr. John Walker, a treating physician, conflicted with Dr. Aggarwal's opinion.

      With respect to Dr. Evans's opinion, the ALJ stated that the assessment by Dr. Evans was entitled to controlling weight because he was a treating physician. The ALJ relied on the "Physical Capacities Determination" completed by Dr. Evans when he found that the claimant was disabled beginning on April 5, 2005. However, Dr. Evans's report stating that claimant was

disabled occurred well after the date last insured and does not state that claimant had listed limitations as of June 30, 2003. Therefore, the ALJ's determination that the claimant failed to establish disability as of June 30, 2003 does not contradict Dr. Evans's report.

In short, the ALJ clearly stated the weight that he gave to the assessments of Dr. Aggarwal and Dr. Evans, explained the reason for those weights, and accepted the treating physician's report. The claimant failed to demonstrate disability on or before June 30, 2003, and the ALJ followed the Appeals Council order to weigh and evaluate the opinions of Dr. Evans and Dr. Aggarawal. For these reasons, the ALJ did not commit reversible error.

**B. SSI Disability Commencement Date**

Plaintiff also argues that the ALJ committed error in his arbitrary choice of April 5, 2005 as a disability onset date for SSI benefits. The court acknowledges that the choice of this date is perplexing and that the ALJ decision's shifting back and forth between April 5, 2004 and April 5, 2005, as if the two dates are interchangeable, raises confusion.

For example, at the beginning of his decision, the ALJ sets April 5, 2005 as the disability onset date. He subsequently focuses on that same date when discussing Dr. Evans's medical source statement dated April 5, *2004*, which indicates that the claimant's pain was "of a degree causing distraction from or total abandonments of tasks." (R. 17). Still later in his decision, the ALJ claims that he "accepts the limitations assessed by Dr. Evans as of April 5, 2004, but not before that date." (R. 20). The ALJ concludes that "beginning on April 5, 2005, the claimant's allegations regarding her symptoms and limitations are generally credible" but then, in the next sentence, states that "claimant's own subjective allegations of chronic debilitating pain and dysfunction [are] credible as of April 5, 2004." (R. 21). In so concluding, the ALJ purports to

19

rely on "medical records from Dr. Evans, who is a treating physician."

As the court views this matter, the ALJ has erred in one of two ways. First, perhaps the ALJ purposely set the disability onset date for April 5, 2005, yet failed to provide the court with sufficient reasoning and substantial evidence to support that determination. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145-1146 (11th Cir. 1991). Or, more likely, the ALJ meant to set the disability onset date to coincide with Dr. Evans's April 5, 2004 medical source statement and erroneously set the onset date at a year later. In either case, the ALJ erred, and substantial evidence does not support his setting the disability date for SSI benefits at April 5, 2005.

### VIII. Conclusion

For the reasons stated, the court AFFIRMS the Commissioner's decision, in part, and REVERSES and REMANDS for the purpose of reconciling confusion concerning the claimant's SSI commencement date. The court will enter a separate order in accordance with this Memorandum Opinion.

DONE and ORDERED this 26th day of June 2009.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE